Good morning. May it please the Court, Carly Gammill on behalf of Appellant Dustin Buxton. It is axiomatic that the government must abstain from regulating or penalizing speech when the motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. So can I ask you a question? My son just did the college application process and he had to write all of these college essays. And you think to the extent that he was applying to state universities, they could not take into account the content of those essays? Actually Your Honor, we have no problem with content being considered. What about the views he expressed in the essays? There is certainly an opportunity for the viewpoint to be considered. What the government cannot do is take that into consideration in a way that expresses an animus toward that viewpoint. So, for example, if you have a student who is applying, a better example maybe would be a job applicant, even though we are not in a job context here, but this is the type of a situation in which viewpoint could be considered. Okay. Actually, why don't we just stick with, since we are talking about an educational program, let's just stick with the college essays. Okay. So if the applicant is applying to a program, we can stick with the radiation therapy program. If they are applying to the radiation therapy program, and in the context of the... Can we just go back to college essays? Oh, I'm sorry. You want to stick with... I do. Okay. College essays. Sorry. So in a college essay, the opportunity for that speech has been invited by the government. So this is private speech that has been invited. And in the context of answering that question, if that question elicits a personal viewpoint, whether it be religious, political, if the rationale for considering that viewpoint is animus toward the viewpoint, we don't want anyone who holds religious views in this program, we don't want anyone who holds conservative political views in this program, or, more to the point here, who actually believes that those should inform his or her life, then that's animus. What if someone doesn't like your viewpoint? I guess I'm not understanding maybe the line you're drawing between kind of animus against a viewpoint and just, like, I don't know, this guy sounds... I'm thinking about my son now, but this guy sounds kind of like a jerk and he cares about sports a lot, and we're looking for people who care about different things. That's okay? Well, someone who cares... Can you have sports animus? I don't know that sports is a viewpoint, first of all. I like sports. Sports are really important to me. Sure, and I think that that is actually more content-based. If what you're looking for is content other than sports... I think sports are the most important thing in life. And if... Okay. Well, first of all, I think we have to go back to whether the speech in itself is protected. I mean, that's something that is an egregious error here by the district court. So is my son's statement that I think sports are the most important thing in life, is that protected? I don't know of any case law that would support the fact that... But you just said that a university in making admissions decisions can't base a decision based on kind of a negative view of the viewpoint that was expressed. So if some admissions officer thinks sports are not the most important thing in life, can he act on that in rejecting my son's application? Your Honor, again, I have to say I don't know that that particular viewpoint is animus based. I don't mean to really bug you on this, but you see the difficulty in the position here. I do. The answer here, though, is, Your Honor, you don't have to go that far in deciding this case. You don't have to determine whether that issue of sports, a love of sports, is in fact protected. We know from numerous Supreme Court cases that private religious speech is protected. But it can't be more. But we also know from all those same cases, it's not more protected than other private speech, because that would be an establishment clause problem. It's just sort of equally protected. You can't single it out for bad treatment, but you can treat it the same way you would treat a love of sports. Well, you certainly can. And again, you cannot focus on the viewpoint, the position with regard to religion, and say that we are not going to accept someone, or here, more to the point, in fact, we are going to penalize someone because they have expressed a religious viewpoint. And that's what happened here. With regard to, and it does get a little bit, I hate to say, confusing, but we obviously have two different standards here. We have a free speech claim that was dismissed on a 12B6 motion, and then we have an establishment clause claim. So the evidence that has been introduced in this case is not relevant to the determination on the motion to dismiss, which is the free speech claim. There is no question that Mr. Buxton sufficiently alleged that he engaged in protected expression when he said that he bases his morals on his faith. There is no question that an adverse action, several, in fact, were alleged, that points were deducted in 2013, that he was denied admission in 2013, and in 2014, not even invited for an interview despite improving his credentials. And he's alleged that all of this happened because he expressed his faith. But you couched your case somewhat under the public forum type of cases. He wasn't denied access to a public forum. Your Honor, it actually, to make it really simple, whether this is a nonpublic forum or whether this is, as the court in Stearns and that the district court relied on or in the Finley case from the Supreme Court, those cases don't involve a specific forum. So, but the analysis is the same, that the restriction on speech has to, first of all, be rationally related to the government's goals, here selecting the most qualified applicants. And it is our rational basis for concluding that someone who brings up his personal faith in response to a question devised by the government itself, that elicited that personal response, that was invited by the government, so there's simply no rational basis for concluding that that statement makes him less qualified to be a radiation therapist. Yet that is the defendant's position here. And it's in the complaint that radiation therapy, that the field itself is no place for religion. That, in fact, you shouldn't bring it up at all in the interview. It can't be brought up by a student, by therapists, that she advised other students that you shouldn't bring it up. If you want to do better in the future in applying to this program, if you want to improve your chances of getting into this program, then don't mention your religion. If that's not a chill on private speech, I'm not sure what a chill would be. Because what other effect would it have than when someone is reapplying the following year, having been told you'll do better if you don't mention your religion, then a question is posed in which the honest answer would be something of a religious nature. Any applicant that wants to get into the program is going to silence that part of his speech and give a different answer, even if that's not the answer to the question. All right. With regard to your retaliation claim, what evidence do you rely on to show that his response to the question was the cause of his not getting into the program? Well, Your Honor, again, this is on a motion to dismiss. So right now, there's no evidence that's at issue. Ultimately, yes, we have to show that. Right now, all we have to do is allege that it was the reason. And we have done that. Because this was a 12B6 decision. That's correct, Your Honor. Can I ask you a question about the procedural posture? Right. The free speech claim, and you just went through this, but the free speech claim is denied on a 12B6, but then the Establishment Clause claim on summary judgment. Yes. And it's the same set of facts that are at issue at both. So is there any reason why we can't look at the summary judgment record? There actually is, Your Honor, and it's this. What's the reason? The evidence that was presented was presented under the Establishment Clause framework. Do you have other evidence? I mean, presumably under the Establishment Clause, you also were trying to show that the reason he was not selected was because of his religious speech. So is there some other evidence that you didn't want to put on on the Establishment Clause that you would put on on the speech case? Your Honor, I I mean, it's the exact same claim. Off the top of my head, I don't, I can't tell you right now, I'm not It's the same claim. Well, it's a similar claim, but the analysis is different. And so I Causation is the same under both, right? Causation would be essential under both. Well, causation is not really an element under the Establishment Clause. It's the purpose, the effect, you know, the entanglement. But so there's no requirement, no element under the Establishment Clause that we show that it's a but, that it's the but for, it's the only one. It can be a motivating, a strong motivating Presumably, but you have to show that it was a motivating factor. So why would you have withheld evidence going to, in your Establishment Clause? I mean, is it your position I'm not sure that we did, Your Honor. I'm not saying that we did. I'm just saying that it was never presented to the District Court in the framework for a free speech claim. And I would say this, that there also is, there's no basis for dismissing on, you know, as to the 2013 retaliation, but yet ignoring the 2014. I mean, and again, the District Court's rationale for dismissing the claim was on the legal aspects of it. Obviously, it wasn't, you know, it wasn't based on any of the evidence. It was based on the facts. But it is important to reiterate that this is a two-year process and that retaliation was alleged in two different years. And so while the evidence is there in the form of an Establishment Clause framework and analysis, it hasn't been analyzed by the District Court, which we believe in the first instance it ought to be. We ought to have the opportunity to present in summary judgment format the free speech analysis. I want to go back to my question, and you're right, it's 12B6. Can you point me to any allegations in your complaint other than the conclusion in paragraph 71 as to what facts you've alleged that support causation? Well, we've actually alleged in paragraphs 28 and 29 that he lost points for, because of the speech. So this is also crucial. This is not, the only effect of the retaliation is not the denial of admission. We are also focused on the deduction of the points. This is a process that is dependent upon points throughout, right? And a single point can determine who gets in versus who doesn't get in. And the first interaction that an applicant has with the individuals making the decision is the interview. And from the very beginning of this interview, this defendant began deducting points. And that's alleged, that points were deducted. And so by the time you get to the end of the interview, instead of having a high score to go with your high scores in your other categories, you know, when you do a written sample, you know, the other elements and the components of it, you end up with a much lower score. And we've alleged that. So your position is you can establish causation without regard to comparison of his score to anybody else's? Absolutely, Your Honor. Yes. That we have alleged that the reason that this defendant deducted points, and we've, in her own words, was because he brought up religion too much in the interview. And then you go on and you start adding up points, or in our client's case, not adding up points because they weren't given, but all after she heard too much religion. And I hesitate, I don't want to get into the evidence on the 12B6 because it's not proper here. But I would say that to the defendant's point that it would be futile to remand because the evidence doesn't help on this score, it actually does. I mean, that's a heavily disputed position between the parties, whether, in fact, the evidence does demonstrate further or just support further the retaliation and including the but-for causation. I also, and I would be remiss in not saying this, this argument about the but-for causation actually wasn't raised below. It's not part of the District Court's analysis. So it is being raised for the first time by a defendant on appeal. And again, I do think that we should have the opportunity in the first instance to present all of the evidence, including on the but-for causation, to the District Court in the analysis under the Free Speech Clause. There are questions about pretext, you know, whether other stated reasons were used. All of that comes into play because the first interaction that an applicant has with these individuals is in the interview, which is where the allegedly offending speech was communicated. And from that point on, essentially for our client, it was all downhill because he mentioned religion too much. With regards to the Establishment Clause, I simply think that there is no question that the evidence was sufficient to withstand a summary judgment decision here, that the District Court, without any explanation, concluded that the defendant's assumption that an applicant mentioning his or her faith, in honest answer to a personal question specifically devised and posed by the interviewers, that that mere mention of faith would necessarily lead to an improper imposition of one's faith in the clinical setting. There is no secular purpose for making that assumption. The statements that she made, that you should leave religion out of the interview, that you brought up religion too much, that you can't bring it up, all of those, again, have the effect of inhibiting one from religious expression. And then furthermore, in terms of entanglement, this is exactly what the Court in Mergens said. If the government begins monitoring speech to ferret out those who would engage in religious speech, that's exactly the kind of invasive monitoring that we're concerned about under the Establishment Clause. So if the Court is to be taken at its word and that the government may not reserve special hostility for those who take their religion seriously and who think that their religion ought to inform the whole of their lives, then there's simply no way that summary judgment could have been properly granted here. Also, I mean, the District Court found, right, that the record establishes that other candidates who mentioned religion, took religion seriously, thought that it inflected their entire lives, were in fact graded favorably and selected for the program. That's actually not the evidence, Your Honor. So you're saying that that's just an incorrect finding? Well, it is an absolutely incorrect finding. Well, first of all, the evidence wasn't that they mentioned faith in their interview. For one thing, one of those applicants did not mention faith. One of those applicants, and the evidence is very clear, simply said that she volunteered at a church. That can mean any number of things. That's not mentioning faith, certainly not mentioning the importance of faith to an individual. The evidence also establishes, and the defendant admitted in her deposition testimony, that two applicants, including the plaintiff here, when they responded to questions 5 and 7, which are questions that very much get at what informs the decisions you make. Question 5 was, what led you to apply to this program? Question 7 was, how have you prepared others in your life for the time commitment and those kinds of things that will take place? She admitted that because these individuals referenced their faith in response to those two questions, that she factored that in, in giving them a low score on those questions. Let me ask you a question. I want to make sure. This is an as-applied challenge, right? That's correct, Your Honor. So it makes no difference what happened to any other individual, does it? The free speech claim is an as-applied, and so it does not matter. We have alleged, though, that there's a pattern in practice because it will happen to more than one. But you're correct, Your Honor. It does not matter. Okay. You've got some time remaining after we hear from Mr. Appley. Yes, sir. Good morning, Your Honors. Good morning. My name is Peter Saucier, and I represent all of the appellees in this matter. I will note that all of the appellees' depositions were taken, and all of the appellees, even those dismissed, were all witnesses. All of the evidence has been gathered, and that this Court can look at this matter because it is a review of law with regard to the free speech. Now, I have to tell you that the Community College of Baltimore County does not, as a policy or practice, discriminate on religion or believe that religion precludes or excludes anyone from any of its programs. So we don't stand by that. We are not that person identified. We are a college, community college, that does two things. We train people for employment. We train them for further education. One of the ways that we train people for employment is a radiation therapy program, a highly competitive radiation therapy program. The reason that this case doesn't approach actionable is that it doesn't deserve to be in the program at all, and let me show you why. Well, she says, as to count one, that doesn't matter whether he would have been admitted or not. In fact, he would have had points deducted, and their view is sufficient to make a claim. Well, I would be happy to address the points deducted part of that because when it comes to that, now that goes to the, as applied and how that works, the allegation is that it chills free speech and that we have an Establishment Clause problem, and the first one is free speech. Now, with regard to that, there is in the record the evidence that Adrian Dougherty, the very same decision maker who is accused of being the ill actor here, in 2012, gave the maximum amount of points in the interview to, and this is at Joint Extract 160, to a person whose answer, what do you value most, was family, God, and couldn't get through it. That's because when you have a case of this type, and you have a plaintiff who is zealously trying to make a case, what happens is something that's said in an interview is blown way out of proportion, and this is a perfect example of that. Here's why I say that. If you look at the radiation therapy program, here's how you get in. You have to have a minimum GPA, and you have to satisfy prerequisites. That gets you, at best, an interview. Forty-four people met that standard. Forty-four people met that standard in 2013. After you cross that bar, your GPA is ranked, and Mr. Buxton's GPA was low. There's a ranking sheet in the Joint Extract at page 145 that shows all of the scores. Then you complete something called an observation. An observation is one of the prerequisites, and an observation requires you to spend time with a radiation therapist who then writes up whether you would be good for the program. You do that before you've ever interviewed. So before any mention of God, religion, or anything else, Mr. Buxton had his observation. Of the 44 candidates, only six got a score below 12, 12 being the maximum. Only six. One of them was Dustin Buxton. In the record, the observation, it is explained why he got such a low score. He asked inappropriate questions at inappropriate times. He was disrespectful to patient and staff. That's all in the evaluation. In fact, it's in the same paragraph where the mention of God in one of his answers comes up. But there's the observation explained. So he got a poor observation score. He has a GPA that's passable to get in, but low as you look at it. Then he has an observation score that nobody has a score that low who has gotten into the program. And after that, he takes a writing sample, before the interview again, on which he got half the points because he didn't answer some of the questions. This is in the same paragraph that mentions his mention of God. This is the writing sample beforehand. Half the questions because he answered them from the wrong perspective. He took a logic exam, a critical thinking, and he did pretty well. So that score shows pretty well in critical thinking, very poor in the writing sample, very bad on the observation, and a minimally passive GPA. This is before the interview. Then comes the interview. And the interview is a panel of five. Five different people of whom Adrienne Doherty is one. She was the only remaining defendant below, and she's the only one of the panelists who was sued, but she was one. And she scored people on the basis of their scores. And she scored Dustin Buxton poorly for a number of reasons that are explained, again, in that same summary. The other evaluators also scored him poorly. His grades from the evaluators are in the joint record extract at 149 and 150, and he did not do well across the board on a number of questions. But what were the comments other than on the one question where he mentioned his religion? The comments were, describe the type of student you are. Comment, he didn't understand the question. It had to be repeated. Repetition. He was given a number of opportunities, and he did poorly. So in the context of that, one of the things that comes up is he volunteered a belief in God and religion. He can do that. That's not a problem. He's allowed to do that. How you do it has a lot to do with whether it's a good answer or not. And how you do it, if you look, just look at the answers on the joint record extract at 160 where Adrienne Doherty grades an answer like that high, on 158 where she grades it high, where she puts volunteer at church, I'm going to suggest that has a religious connection. I think you can take that notice. In there is volunteers at church, and it's very much a people person who's very respectful and resilient. You see, the answer can be more. So is there such a thing as there's too much of a religion focus? Well, there can be. And there has to be that kind of a judgment because you have five decision makers who are now going to rate what's going to be 20% of the admission, 20% in the interview. And they have to bring to the table their common experience. That's why you have a panel of five. Now, we're a community college with 55,000 students, 5,000 employees, and we can't police everybody's every question and every answer they give and everything they write down. That's not practical. But we can say that we don't use religion to screen things out. And when we look at what Adrienne Doherty wrote here, and that was the answer that she wrote on this thing, and it meshes with these documents, this is part of getting into, selected into a radiation therapy program. It was not terribly bad advice to say, gosh, maybe you need to focus more on what will make you a radiation therapist. Because religion is not part of this, and we did not ask about religion. So your process, your contention is that the process you put in place is sufficient under Lemon to say it was for a purely secular reason and not a sham. It is. It's not perfect, Your Honor. I wouldn't suggest it is. And in fact, I think if you read some of the questions, why are they asking this? But it is a fair process. And here's what's interesting. It strikes me here about the process. We have the year before, the candidate who answered family, God, and Adrienne Doherty gave her full points on the highest amount of points she could give to this candidate. And that candidate was admitted. And I just have visions of me being here, and instead of it being the ACLJ, it's the ACLU saying, why did Adrienne Doherty give her credit for answering God? You can't bring God into the radiation therapy program. Okay. Again, I'd be saying the same thing. It's part of one component of how you answer the question. And that's all it is. So this is unlike, it's hard to find a reported case to figure out how to handle this. Because this is unlike reported cases. It's unlike reported cases in that this college does not say we have the right to take God into account or use religion or do that. We don't say that. So it makes it difficult to use those cases. Mr. Buxton was not qualified for the program, and I would point out his GPA not only was low, but he wasn't qualified, and then this happened, the retaliation. Let's talk about the retaliation. Two things about the retaliation. One is that Adrienne Doherty had a program in which 44 candidates in 2013 were interviewed for 15 spots, and the next year there were 72 applicants. Too much. Too much. So the decision was made to cut the applicant pool to 36. When that happened, one of the decisions was if you didn't have a 12, we knew if you didn't get a 12, you were highly unlikely to get in, almost impossible to get over that hurdle. We'll use that as a cutoff. And those who don't have a 12 and have a zero, that's one of the cutoffs we'll use. Mr. Buxton was affected by that, as were seven other candidates. That's in the record. But here's what's more interesting about that. At the end of the process in 2013, Adrienne Doherty said to Dustin Buxton, in addition to other things she may have said about watch your interviewing style, she said, why don't you get an observation done again because your observation score is very low? He did not do that. And she said, why don't you meet with the counselor who she named? And this counselor can help you figure out better how to answer questions. He did not do that. So when it's the next year and he has the low observation score that he was advised, bring it up. Go get a 12. Didn't do that. Go get some counseling about how to answer questions. And he didn't do that. That's what happened there. So when you look at that record as a whole, there's very little a college can do in this circumstance, other than what would the remedy be? Here's a gentleman with a poor observation score, medium GPA, not doing well on a writing sample, not getting a counseling, not repeating the observation. Well, the solution is going to be let him into the program because he mentioned God? And you can't take that into account? I think the answer to that question has to be no. So I don't suggest that Adrienne Doherty should have necessarily mentioned that. And it's interesting because she was being honest and trying to be helpful. I mean, she was being helpful in the observation score, helpful on the other things. And I'll point this out. In the record, it's established that Mr. Buxton, we'll talk about chilling effect, did not even focus on the religion part of this until after the 2014 process. He had lodged a complaint of sex discrimination with the college. And in the process of his sex discrimination, he wanted to say, I want to see my evaluation. And they read to him the whole full paragraph, the God part's in there, but the whole full paragraph that's in that record that I've cited to you. And when they read that to him, he said, hmm, he was asked about this at his deposition, said, so you felt discriminated against based on your gender. Did you tell him, this is a, by the way, joint record I expect, 87. Did you tell him you felt discriminated against because of anything else? I do not recall. Okay. Then he said, wait, I do recall after he read me the review and the specific part about Adrienne Doherty mentioning faith. I did state to him, she can't put that in there. That's it. He didn't file a complaint. He didn't feel chilled. He says that when he heard that, he said, oh, hey, I don't think she can put that in there in the context of his filing of sex discrimination. So I don't think this has the practical chilling effect. So what we have is, and the cases cited in our brief stand for those propositions, and I won't board a court by telling them what cases say, but I will say this. The Order Cicero once said about another order that he has a tendency to create billows in a ladle which we have now mangled into our American English as a tempest in a teapot. And I would suggest to this Court that this is very much the tempest in the teapot, that the right outcome was the outcome below, and that there's no need for any further consideration of this case. If there are no more questions, I'll conclude my argument. Thank you. Okay. Thank you. Ms. Gamble, reply. I have a lot to say and a few minutes to say it as a response to that. First of all, the statement that CCBC is not what I described initially is not the issue here. For purposes of this case, Adrienne Doherty is CCBC, and her statements and her actions are attributable to the government. That cannot be overlooked. It was said that Mr. Buxton was not a qualified candidate. The defendant has admitted in its briefing, it's also in the published criteria, that only the top qualified candidates get invited for an interview. And it's beyond dispute we're here because Mr. Buxton was invited for an interview in 2013. So he clearly was one of the top qualified candidates. There's no question about that. In 2014, he had improved his credentials. You heard counsel describe the process that first you take your prerequisites. Mr. Buxton did that and, in fact, went back and improved his grades in his prerequisites. Then your GPA is ranked. So at least in the second year that he was applying, he had one of the top GPAs. Here's what counsel didn't tell you, and it is in the evidence, that defendant told her supervisor prior to the 2014 admissions process, she didn't think Mr. Buxton should be allowed to interview. She then decided to select the interviewees for 2014 based on their combined score for their observation day and their GPA. She decided that she would not grant an interview. Not you have to have a 12. That's not accurate. The evidence is I won't grant an interview if you have a zero. And, oh, by the way, Mr. Buxton, for miscellaneous issues, I'm giving you a zero. Don't think you should be able to apply. Don't know that I can keep you from doing that. I'm not going to interview anyone who has a zero. He has a 7.2. Let's make that a zero. Now I don't even have to interview him. All of that, in our allegations and based on the evidence, because he brought up religion too much. We focused a little too much on another applicant mentioning God in response to question three. Adrienne Doherty didn't say that these individuals lost points or were denied admission because they referenced religion. In her view, if you are too religious, this is no place for you. And she has made that abundantly clear in a number of statements. She's admitted her goal in advising these students to do better. You can do better and improve your chances of getting admitted if you don't mention religion at all. In fact, she said as to one of these applicants, I felt if he didn't mention religion at all, then he would be able to completely answer a question. So in the reverse, only if you don't mention your religion can you completely answer a question. She testified that it's her view that an applicant responding that his religious faith is what he values most in life is a marginal generic answer. She acknowledged on Mr. Buxton's 2013 interview form that he was both prompt and articulate. A possibility of five points that you can get for that. Inexplicably, she gave him a free speech claim, as applied. What she did to others doesn't matter. On the establishment clause claim, sure, we have to take into account overall what's happening. Overall, these are the statements, multiple ones by this defendant, evidencing clearly an anti-religious bias. And not to mention the assumption that mentioning your religion for her liking too much in the interview process is going to bring it up in the radiation therapy clinic. But there's a problem with that. She already has in place instructions in the orientation process. She instructs students about when religion can be brought up in the clinic and that that's by patients and how you can appropriately do that. Since she's already got that safeguard in place, why would you need to penalize students or even tell them not to bring it up in the clinic? Why would you need to do it? This is actually very reminiscent of an 11th Circuit case in which the court held, this is the Keelan case, in which the court held that when a student indicated an intention to violate policy and discuss faith and proselytize in violation of the school's policies, then to say, no, we need assurances that you won't do that, doesn't violate the free speech clause. However, to assume beforehand that that's going to happen, that's actually a prior restraint on speech. So that's exactly what happened here. She assumed beforehand that the mere mention of one's personal religious faith in an interview process was automatically a disqualifying factor. And again, while that may not be CCBC in general, for this case she is CCBC and she made those decisions and she applied them to Mr. Buxton and, in a larger context, to multiple applicants. I have further responses to the evidentiary positions. If Your Honors are interested in that or if you have further questions, I'm happy to answer those. Well, I think we understand your position. Thank you. Okay. Thank you. All right. I'll ask the clerk to adjourn the court. Then we'll come back to the Greek This Court stands adjourned until this afternoon. God save the United States and its Honorable Court.
judges: William B. Traxler, Jr., Henry F. Floyd, Pamela A. Harris